## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ALYSON CLARK,** *Administrator of*
*the Estate of Logan Clark,*

                **Plaintiff,**                             **Case No. 1:20-cv-300**
                                                               **JUDGE DOUGLAS R. COLE**

    **v.**

**BRENT WHALEY,** *et al.,*

                **Defendants.**

### OPINION AND ORDER

On April 29, 2019, Logan Clark drove home on Interstate 71 ("I-71") after an evening that included at least a few drinks. When his northbound exit was closed, he attempted a U-turn through the grassy median to reach the southbound lanes so he could use that exit. He got stuck. Defendant Brent Whaley, a Sheriff's Deputy who observed the maneuver, stopped to investigate. He cited Clark for driving in the median but claims he did not detect that Clark was intoxicated. Whaley left the scene when Clark told him a tow truck was on the way. It never arrived. About an hour later, Clark tried to walk across the highway, only to be struck and killed by a semi-truck. Clark's sister, Alyson, as administrator of Clark's estate,[1] sued the semi-truck driver, the company that employed her, Deputy Whaley, and Whaley's supervisor, Lieutenant Ryan Saylor. The Court previously granted summary judgment to the semi-truck defendants. (Doc. 62). The matter is now before the Court on the officers'

---

[1] Throughout this Opinion, the Court refers to Logan Clark as "Clark" and Alyson Clark as "Plaintiff Clark."

Case: 1:20-cv-00300-DRC Doc #: 86 Filed: 01/05/23 Page: 2 of 21 PAGEID #: 2799

Motion for Summary Judgment. (Doc. 75). For the reasons below, the Court **GRANTS** Defendants' Motion as to Plaintiff Clark's federal-law claims and **DISMISSES** those claims **WITH PREJUDICE**. Separately, the Court declines to retain supplemental jurisdiction over Plaintiff Clark's state-law claims, which raise novel and unsettled questions of Ohio law, and so **DISMISSES** those claims **WITHOUT PREJUDICE**.

**BACKGROUND**

The facts are largely—although not entirely—undisputed. On April 29, 2019, Logan Clark left his job at Outback Steakhouse around 7:00 p.m. and stopped at a nearby bar around 8:00 p.m. to have a drink. (Hounshell Dep., Doc. 69, #2258, 2266).[2] One became a few. Over the course of the evening, he consumed (at minimum) three to four alcoholic beverages. (*Id.* at #2269–70). He drank three of those before 9:23 p.m., at which point he left the bar for approximately two-and-a-half hours. (*Id.* at #2271; Hounshell Rep., Doc. 70-1, #2291). During that time, no one knows where he went or what he did. (Doc. 69, #2271). Clark then briefly returned to the bar just before midnight to purchase a final drink at 11:57 p.m., carrying it out of the bar with him (and presumably drinking it). (*Id.* at #2270; Doc. 70-1, #2291). He then climbed into his car to drive home, which ultimately led to him traveling northbound along I-71. (Doc. 70-1, #2291, 2434).

About fifteen minutes after Clark left the bar, Warren County Sheriff's Deputy Brent Whaley observed Clark driving in the left northbound lane on I-71. (*Id.* at

---

[2] Warren County Sheriff's Office Sergeant Joseph Hounshell oversees the criminal investigation section of the Sheriff's Office. (Doc. 69, #2214). In connection with Clark's death, Hounshell prepared a comprehensive report. (Doc. 70-1).

#2291). Just past mile marker 31, Clark turned left into the highway's grassy median.[3] (*Id.*; Incident Rep., Doc. 38-1, #1339). Deputy Whaley activated his overhead lights and pulled up behind Clark, who had lost traction in the median and become stuck. (Doc. 38-1, #1339). On that portion of I-71 north, two traffic lanes go in each direction (with a shoulder on each side of both the northbound lanes and the southbound lanes), separated by a grassy median. (Whaley Dep., Doc. 37, #1193). The area is not illuminated. (*See* Richardson Decl., Doc. 30-1, #648).[4] The speed limit is seventy miles per hour. (Bens Dep., Doc. 28, #160).[5]

After parking on the left shoulder of the northbound lanes, Whaley exited his vehicle and approached Clark's car. (Doc. 37, #1198–99). He spoke to Clark through the open passenger window. (Doc. 38-1, #1339). Clark informed Whaley that he lived in Lebanon, Ohio. (*Id.*). He also told Whaley that he had planned to exit I-71 onto State Route 48, only to find the ramp closed. (*Id.*). Not knowing how else to get home, Clark decided to perform a U-turn (from I-71 North to I-71 South) by driving directly through the highway's median. (*Id.*). When Deputy Whaley requested identification, Clark started to hand Whaley his Speedway rewards card but stopped when Whaley pointed this out. (Whaley Dep., Doc. 37, #1222). Clark then conceded he did not have his driver's license with him, and he instead provided his social security number. (Incident Rep., Doc. 38-1, #1339). Whaley briefly returned to his cruiser where he

---

[3] From all available evidence, it does not appear Clark pulled into a designated turn-around, but instead turned into the grassy median itself.

[4] Carl and Kelly Richardson were co-drivers of the truck that hit Clark. (Doc. 30-1, #645).

[5] This is the deposition of Warren County Sheriff's Deputy Richard Bens. (Doc. 28, #125).

wrote Clark a citation for driving his vehicle in the median. (*Id.*). Whaley then returned to Clark's car to issue him the citation. (*Id.*).

Although Plaintiff Clark disputes this,[6] Whaley says he did not detect any of the traditional signs of intoxication from Clark during their interaction. (*Id.*). For example, Whaley states Clark was responsive and calm, spoke without slurred speech, and did not have an odor of alcohol, shaky hands, red or glassy eyes, a flushed face, or a blank stare. (*Id.*). Indeed, on two occasions, Clark thanked Whaley and shook his hand without difficulty. (*Id.*). Despite this, Whaley at some point decided to ask Clark to submit to a Portable Breath Test (e.g., a breathalyzer). (Doc. 37, #1226–27). Clark readily consented and denied having consumed any alcohol. (*Id.*; Doc. 38-1, #1339). For whatever reason, Whaley changed his mind and did not administer the test.[7] (Doc. 37, #1227).

After issuing the citation, Whaley told Clark he could leave and returned to his cruiser. (Doc. 38-1, #1339). Clark tried to depart, but his car remained stuck. (*Id.*). At that point, Clark exited his vehicle and again spoke to Whaley, explaining that he could not get traction. (*Id.*). Whaley offered to call a tow truck, but Clark declined, responding "I got it" and informing Whaley that he had already arranged a tow. (*Id.*). Clark thanked Whaley for the offer, and they shook hands; both then re-entered their respective vehicles. (Whaley Dep., Doc. 37, #1227; Incident Rep., Doc. 38-1, #1339).

---

[6] Plaintiff Clark disputes that Whaley did not recognize Clark's intoxication. She does so based on expert testimony, coupled with the amount of alcohol detected in Clark's body during the autopsy. (Resp., Doc. 77, #2574).

[7] There is some dispute about whether Whaley asked this question as matter of routine or if something about Clark's demeanor prompted Whaley to ask it here. (*See* Resp., Doc. 77, #2567).

Whaley left the scene around 12:29 a.m., before any tow truck arrived. (Doc. 38-1, #1339).

Whaley's departure violated a Warren County Sheriff's Office policy against abandoning stranded motorists. (*Id.*; Payne Dep., Doc. 65, #1806). While Whaley was driving away, he radioed Warren County Sheriff's Office Lieutenant Ryan Saylor to inform him of the events, including that he had left Clark before the tow truck arrived. (Incident Rep., Doc. 38-1, #1339). According to a Narrative Supplement to the incident report, the entire interaction between Whaley and Clark lasted 21 minutes and 48 seconds.[8] (*Id.*). And throughout, Clark and his vehicle remained in roughly the same location in the median. (*Id.*).

Sadly, the tow truck never arrived. Instead, at approximately 1:22 a.m. on April 30, 2019, nearly an hour after Whaley left the scene, a semi-truck struck and killed Clark as he attempted to walk across the northbound lanes of the highway. (Hounshell Rep., Doc. 70-1, #2291). An autopsy report found that Clark had a high level of alcohol in his system—.157 in his blood and .192 in his vitreous fluid. (Hounshell Dep., Doc. 69, #2272). No facts suggest he had more to drink following Whaley's departure (e.g., there is no evidence that he stored or drank more alcohol in his vehicle). (Payne Dep., Doc. 65, #1728). And Clark bought his final (known) drink

---

[8] The Narrative Supplement's timeline is somewhat contradictory. (*See* Incident Rep., Doc. 38-1, #1339). In the document, Whaley reports he approached Clark at 12:11 a.m. and returned to his cruiser at 12:29 a.m. (*Id.*). Defendants' Motion for Summary Judgment likewise says that Whaley departed at 12:29 a.m. (Doc. 75, #2432). This suggests the stop lasted roughly 18 minutes. Yet the Narrative Supplement separately states that the stop lasted "21 minutes and 48 seconds." (Doc. 38-1, #1339). This roughly four-minute discrepancy does not impact the Court's holding.

at 11:57 p.m.—fifteen minutes before encountering Whaley and an hour-and-a-half before his death. (Doc. 70-1, #2291). Yet, the evidence also can only conclusively prove that Clark consumed three drinks and bought a fourth that evening, which he carried out of the bar. (Doc. 69, #2269–70). That presents a bit of a quandary. If Clark consumed *only* three or four standard-pour bar drinks over the relevant six-and-a-half-hour period (from 7:00 p.m. to 1:22 a.m. when the truck struck him), that would not explain the alcohol levels the autopsy detected. Thus, Clark likely consumed additional alcohol, either before midnight or after Deputy Whaley left the scene.[9]

Shortly after the incident, the Warren County Sheriff's Office opened an investigation into Whaley's conduct. (Doc. 65, #1713). A lieutenant in the office reviewed the available materials and interviewed Whaley, Saylor, and others. (*See* Doc. 66-1, #1797–1802). The investigation ultimately concluded: "Deputy Whaley violated [Warren County Sheriff's Office] Traffic and Motorist Services policy 61.4.1 when he abandoned a stranded motorist. Deputy Whaley failed to take appropriate action in accordance with the policies of this agency and therefore was unsatisfactory in his performance." (*Id.* at #1806).

On April 15, 2020, Alyson Clark, as the administrator of Logan Clark's estate, sued in this Court. (Doc. 1). Plaintiff Clark's suit named Deputy Whaley and

---

[9] Of course, a single "drink" does not always contain a fixed quantity of alcohol. Clark's first three drinks were a beer and two shots, so those are a given. (Hounshell Dep., Doc. 69, #2269–70). And he consumed them before 9:30 p.m. So, it is perhaps possible that Clark's fourth drink near midnight contained a very large quantity of a high-proof liquor, which possibly could have led to the alcohol levels detected in Clark's autopsy. It strikes the Court that the more likely explanation, though, was additional, unaccounted for, alcoholic drinks. In any event, the evidence does not show what drink Clark ordered at 11:57 p.m. (*Id.* at #2259–60).

Lieutenant Saylor in their individual and official capacities, along with the semi-truck driver and trucking company. (*Id.* at #1). (The Court previously granted the latter two summary judgment. (Doc. 62).) As against the two officers, Plaintiff Clark proceeds under § 1983. (Doc. 1, #10–20). She alleges that Whaley violated Clark's constitutional rights by abandoning him in a dangerous position along the highway and that Saylor is liable for failing to supervise Whaley. (*Id.*). Plaintiff Clark also alleges that Whaley and Saylor committed various torts under state law. (*Id.*).

After the parties completed discovery, Deputy Whaley and Lieutenant Saylor moved for summary judgment on all remaining claims. (Doc. 75). Both argued they did not violate Clark's constitutional rights and, in any event, are entitled to qualified immunity. (*Id.* at #2421). They further contend that state-law immunity shields them from Plaintiff Clark's state claims. (*Id.* at #2422). Plaintiff Clark counters that Whaley violated Clark's substantive due process rights by failing to protect him from danger. (Resp., Doc. 77). Specifically, Plaintiff Clark disputes that Whaley did not recognize Clark's intoxication, offering expert testimony to prove this point. (*Id.* at #2577; Doc. 76-1, #2542). And she claims that Saylor failed to properly supervise Whaley when Saylor learned of his policy violation. (Doc. 77, #2577–78). Defendants thereafter replied. (Doc. 82).

## STANDARD OF REVIEW

Defendants seek summary judgment. "The 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the

absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

But the non-moving party cannot defeat summary judgment merely by pointing to *any* factual dispute. Indeed, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could matter to the outcome).

In sum, after reviewing all of the cited evidence, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

Whether or not facts are material turns to some extent on the nature of the claims involved. Here, as noted, Plaintiff Clark's federal claims arise under § 1983.

To prevail on that claim, she must show that the officer defendants violated Clark's constitutional rights. Even then, the officers are entitled to qualified immunity unless their conduct "violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). Thus, the officers can prevail at summary judgment by showing either that there was no constitutional violation, or that any violation did not involve a clearly established constitutional right. *Id.* (citing *Sample v. Bailey*, 409 F.3d 689, 696 (6th Cir. 2005)). And the Court is free to take those two questions—the existence of the constitutional right, or whether it was clearly established—in either order. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Here, the Court starts with the former, and as it concludes no constitutional violation occurred, the Court ends its analysis there.

## LAW AND ANALYSIS

Logan Clark should not have died on April 30, 2019. But the fact of his death alone does not create liability nor overcome summary judgment. Rather, the Court must evaluate whether the record evidence reveals a genuine issue of material fact as to whether Deputy Whaley and/or Lieutenant Saylor violated Clark's rights. Here, the record evidence does not. Accordingly, neither officer is liable in either their individual or official capacities. This entitles Defendants to judgment as a matter of law on Plaintiff Clark's § 1983 claims.

Plaintiff Clark's state-law claims, though, may present a closer question. Indeed, they appear to involve a matter of first impression under state law. So the Court concludes that, as it is dismissing the remaining federal claims, the Court will decline supplemental jurisdiction over those state-law claims.

## A. Plaintiff Clark Has Not Created A Genuine Issue Of Material Fact That Defendants Violated Clark's Substantive Due Process Rights.

Plaintiff Clark begins her Complaint with her federal-law claims. She alleges that Whaley and Saylor, in their individual and official capacities, violated Clark's Fourteenth Amendment substantive due process rights. (Resp., Doc. 77, #2570–71). In pressing these claims, she faces an uphill battle. After all, neither Whaley nor Saylor directly harmed Clark; rather, a private actor struck Clark roughly an hour after Whaley left the scene. Plaintiff Clark's claims rest not on what Whaley and Saylor did, but rather what they did *not* do. Namely, Whaley did not breathalyze Clark (which presumably may have led to Clark's arrest for driving under the influence), nor did he stay with Clark until a tow truck arrived. Saylor, for his part, knew of Whaley's decisions and did not instruct Whaley to do anything different.

The reason this complicates things for Plaintiff Clark is that, as a general matter, state officials have no constitutional duty to protect the public from dangers private actors pose. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). That is not the end of the story though. This general rule comes with exceptions, and Plaintiff Clark points to two: the state-created-danger exception and the custodial exception.

10

The state-created-danger exception imposes liability on state officials who perform affirmative acts that place someone in a dangerous position, even if a third-party's act ultimately causes the harm. *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). To avail themself of this exception, a plaintiff must make three showings:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). But critically, under the first prong, "[t]he question is not whether the victim was safer during the state action, but whether he was safer *before* the state action than he was *after* it." *Id.* (emphasis added); *see DeShaney*, 489 U.S. at 201 ("That the State once took temporary custody of [plaintiff] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been in had it not acted at all.").

Plaintiff Clark's claim fails under this framework; she cannot show Whaley undertook an "affirmative act" that "created or increased" any risk to Clark. *Cartwright*, 336 F.3d at 493. Rather, Clark's problems arose from getting his car stuck in the interstate median, an act he undertook on his own, perhaps as a result of having consumed alcohol. Both when Deputy Whaley arrived, and when he departed, Clark and his disabled car sat idle where Whaley found them. Thus, Clark was in the same danger when Whaley left as when Whaley arrived. And while true that Clark may have been "safer during the state action," i.e., Whaley presumably

would have prevented Clark from walking into traffic, the doctrine precludes consideration of the safety that an officer's presence creates. *Id*. And all of this is true even more as to Saylor, who was not even present. Plaintiff Clark points to no affirmative act that Saylor took that increased Clark's danger.

Plaintiff Clark responds by asserting that Whaley took the affirmative step of abandoning Clark, an inebriated and stranded motorist. (Resp., Doc. 77, #2576). But she points to no authority that says merely leaving a scene, without more, is an affirmative act. And her inability to identify precedent supporting that position makes some sense. Plaintiff Clark essentially argues that, by leaving, Whaley elevated Clark's risk of harm. But this is just another way of saying Clark was "safer during" Whaley's presence—a non-starter. *See Cartwright*, 336 F.3d at 493. In sum, Defendants did not violate Clark's rights under the state-created-danger exception.

Plaintiff Clark likewise falls short on the custody exception. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety." *DeShaney*, 489 U.S. at 199–200. The duty arises "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety." *Foy v. City of Berea*, 58 F.3d 227, 231 (6th Cir. 1995). For this obligation to arise, though, state officials must first place the plaintiff in custody akin to that of "incarcerated prisoners, those involuntarily committed to mental institutions, foster children, pre-trial detainees,

12

and those under 'other similar restraint of personal liberty.'" *Jackson*, 429 F.3d at 590 (quoting *DeShaney*, 489 U.S. at 200). "The overarching prerequisite for custody is an affirmative act by the state that restrains the ability of an individual to act on his own behalf." *Id.*

Two related problems arise with that approach—(1) Whaley never placed Clark in custody, and (2) even if he had, Whaley, who was no longer on the scene, owed Clark no residual duty when the accident occurred.

As to the former, Whaley did not arrest Clark, nor otherwise meaningfully restrain his liberty. At most, Whaley seized Clark in a brief *Terry*-style stop while issuing the citation. *See Terry v. Ohio*, 392 U.S. 1, 30–31 (1968) (permitting officers to briefly seize a person based on reasonable suspicion); *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) ("Traffic stops are analyzed under the *Terry v. Ohio* framework because they are more akin to an investigative detention ... than a custodial arrest." (internal citation omitted)). And courts have recognized such brief and unintrusive detentions differ from the "custody" *DeShaney* envisions.[10] *Forrester v. Stanley*, 394 F. App'x 673, 674–75 (11th Cir. 2010) (holding that a *Terry*-stop did not place the detainee "in custody" under the Fourteenth Amendment custody exception); *Villalon v. City of McAllen*, No. 7:20-cv-264, 2022 WL 1547759, at *6–7

---

[10] Granted, the *Terry* doctrine exists under the Fourth Amendment, 392 U.S. at 30–31, while the custody exception applies to claims under the Fourteenth Amendment. And the Court knows of no reason why "in custody" under the Fourteenth Amendment and "in custody" under the Fourth Amendment must necessarily refer to precisely the same circumstances. But it is difficult to imagine a circumstance where a police officer performs a brief *Terry*-seizure in a manner that so restrains a detainee's liberty that it creates custodial relationship under the Fourteenth Amendment.

(S.D. Tex. Apr. 7, 2022), *report and recommendation adopted*, 2022 WL 1540425 (S.D. Tex. May 16, 2022) ("[A] *Terry* stop will [not] give rise to [a Fourteenth Amendment custodial duty] due precisely to the lack of custody"); *see also Foy*, 58 F.3d at 229–31 (recognizing that a brief interaction with police did not place the plaintiff in custody); *Moore v. LaSalle Corrs., Inc.*, No. 3:16-cv-1007, 2018 WL 2294220, at *3 (W.D. La. May 3, 2018), *report and recommendation adopted*, 2018 WL 2292760 (W.D. La. May 18, 2018) (declining to impose a duty on police to provide plaintiff medical care where police performed a *Terry*-stop).

Further confirming this result, it is difficult to see how, as a factual matter, Whaley's brief investigative seizure placed Clark "in custody." Unlike the examples of "custody" that *DeShaney* provides, Whaley did not handcuff Clark, detain him in his squad car, transport him to another location, or perform any other "similar restraint of personal liberty."[11] *Jackson*, 429 F.3d at 590 (quoting *DeShaney*, 489 U.S. at 200); *see also Cartwright*, 336 F.3d at 492 (finding no custody where police gave plaintiff a consensual drive to a safer area). Likewise, Plaintiff Clark offers no colorable argument that Saylor, without being present, placed Clark in custody.

---

[11] In determining when a party is in or remains in custody, the Sixth Circuit also relies on whether the person (rather than the officer) made the decision to terminate the interaction. *See Salyers v. City of Portsmouth*, 534 F. App'x 454, 459 (6th Cir. 2013) ("In this case, [the plaintiff] was free to choose where to go, and exercised that freedom by refusing [the officer's] alternative suggestions."); *Stemler v. City of Florence*, 126 F.3d 856, 862 n.2 (6th Cir. 1997) (finding police liable where the intoxicated plaintiff "involuntarily left the scene of the police stop"). This too demonstrates Clark was not in custody, as the interaction ended at Clark's prompting. Deputy Whaley only left after Clark rejected Whaley's offer to help, said "I got it," shook Whaley's hand, and thanked him. (Incident Rep., Doc. 38-1, #1339).

14

Moreover, even assuming Clark was in custody *during* the interaction, Whaley owed Clark no residual duty arising from that custody when the accident occurred an hour after Whaley left. As a general matter, the custodial duty continues only during the duration of the custody itself. *See Williams v. City of Georgetown*, 774 F. App'x 951, 955 (6th Cir. 2019) (noting the lower court did not analyze the custodial exception "because Burns was not in police custody when he was killed"). Here, any hypothetical custody had long since ended when the accident occurred. And, as described more fully below, while circumstances may exist where the custody-based duty extends past the end of the custody, those circumstances were not present here.

Clark's rejoinder as to both custody exception shortcomings is that her case mirrors *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998). There, police arrested an inebriated person in downtown Flint, Michigan, took him to a nearby police station, and then transported him to the county jail. *Id.* at 1023–24. When that facility was full, the officers drove the person to an unfamiliar area outside the city limits and left him at the side of a 55-mile-per-hour road without lights or sidewalks to "teach [him] a lesson." *Id.* A car later struck the plaintiff, and the plaintiff sued the officers claiming they violated his substantive due process rights. *Id.* at 1024–27. On this egregious set of facts, the Sixth Circuit sided with the plaintiff. *Id.* at 1027.

In fairness to Clark's argument, the Sixth Circuit opinion in *Davis* certainly suggests that the duty custody creates can extend past the end of the custody itself.[12]

---

[12] This approach comes from language in *DeShaney*, where the Supreme Court noted that a state actor owes no ongoing duty to a person previously in custody where the state actor

Specifically, *Davis* held that officers have a duty not to "put [a person] in a situation, while in custody, … that caused [them] injuries," and that this duty extends "even after the custodial relationship has ended." *Id.* at 1026.

But despite some factual similarities, *Davis* is inapposite. First, before it can matter when Whaley's custody-based duty to Clark *ended*, Plaintiff Clark must first answer: "Was there custody at all?" There, *Davis* does not help her. In *Davis*, the police clearly placed the plaintiff in custody by arresting and transporting him. Here, by contrast, Whaley did not arrest Clark, let alone transport him. As a result, no custody-based duty arose in the first instance. Second, the post-custody duty *Davis* envisioned concerns not leaving the person worse off as a result of the way officers released the person from custody. As noted, Whaley left Clark in no worse shape than Whaley found him.[13] Accordingly, Plaintiff Clark has not shown how the events here could possibly fall within the custody exception.

Perhaps sensing these shortcomings, Plaintiff Clark makes much of her view that Whaley recognized Clark's intoxication and acted with "deliberate indifference" towards his wellbeing when stranding him. (Resp., Doc. 77, #2575). But absent

---

"places him in no worse position than that in which he would have been had [the state actor] not acted at all." 489 U.S. at 201.

[13] The post-release custodial duty *Davis* recognized may fit more comfortably under the state-created-danger exception rather than the custody exception. *See Johnson v. Metro. Gov't of Nashville*, 512 F. Supp. 2d 1129, 1134–35 (M.D. Tenn. 2007), *aff'd*, 294 F. App'x 995 (6th Cir. 2008). The "affirmative act" the state-created-danger exception requires could be seen as the act of releasing the person from custody. Accordingly, if that affirmative act makes the person less safe, that could give rise to liability under the state-created-danger exception for third-party acts. *See R.S. v. Lucas Cnty. Child.'s Servs.*, No. 22-3501, 2022 WL 17730531, at *4 (6th Cir. Dec. 16, 2022) ("Taking control and making a status-quo changing decision that leaves the victim less safe is an affirmative act.").

16

placing Clark in custody or taking an "affirmative act" that increased his danger, Whaley cannot have acted with deliberate indifference as a constitutional matter by leaving Clark along the highway. Without more, Whaley's "failure to protect" Clark "against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.

Finally, and briefly, Plaintiff Clark's supervisory claim against Saylor in his individual capacity and her official capacity claims likewise fail. First, Saylor cannot be held liable in his individual capacity for failing to supervise Whaley because Whaley did not violate Clark's rights. *McQueen v. Beecher Comty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor.").

Next, for similar reasons, neither Whaley nor Saylor can be liable in their official capacities. By naming them in their official capacities, Plaintiff Clark brings a § 1983 *Monell* claim against the Warren County Sheriff's Office itself.[14] *United Food & Com. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 752 (6th Cir. 2004). And because Plaintiff Clark has failed to show that either Whaley or Saylor violated Clark's rights, the Warren County Sheriff's Office cannot be subject to *Monell* liability. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying

---

[14] Plaintiff Clark never explicitly says she desires to hold the Sheriff's Office liable under a *Monell* theory. However, she intends to hold the Saylor liable in his official capacity for "inadequately supervis[ing] Defendant Whaley when he knew and approved of him leaving a stranded motorist in the middle of the highway." (Resp., Doc. 77, #2578). This is, in essence, a *Monell* claim.

17

constitutional violation by its officers." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))); *Brooks v. Werth*, No. 4:20-cv-38, 2020 WL 2615516, at *6 (N.D. Ohio May 22, 2020) ("[B]ecause no constitutional violation has been shown, Plaintiff's *Monell* claim against Chief Werth, in his official capacity … cannot survive as a matter of law. There can be no liability under *Monell* without an underlying constitutional violation.").

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 75) as to Plaintiff Clark's federal claims. The Court **DISMISSES** those claims **WITH PREJUDICE**.

## B. The Court Declines To Rule On Defendants' Motion For Summary Judgment As To Clark's State-Law Claims.

In addition to her federal claims, Plaintiff Clark also asserts various state-law claims. The Court originally exercised supplemental jurisdiction over these state claims, as 28 U.S.C. § 1367 allows. But now, no federal claims remain in this action, so the Court must consider whether to maintain that jurisdiction.

Once all federal claims are dismissed, a district court's decision whether to retain supplemental jurisdiction over state-law claims is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)). "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). In addition, a district court should consider whether the pendent state

18

claim involves a novel or difficult question of state law. 28 U.S.C. § 1367; *see Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1055 n.11 (6th Cir. 1986) (affirming a district court's continued exercise of supplemental jurisdiction in part because "the district court was not called upon to interpret some abstruse Ohio legal doctrine").

Given the remaining state-law claims here, the exact contours of state-law official immunity may matter. Whaley, in performing his official duties, has state-law immunity unless (in part) his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A). And "the violation of [a] departmental policy enacted for the safety of the public … may be relevant to determining the culpability of a course of conduct." *Anderson v. Massillon*, 983 N.E.2d 266, 274 (Ohio 2012). But a defendant's violation is reckless under § 2744.03(A) only where the defendant intentionally violated the provision and the violation "involv[ed] a high degree of probability that serious harm will result." *Id.* (quoting 2 Restatement (Second) of Torts § 500, Comment e (1965)); *Argabrite v. Neer*, 75 N.E.3d 161, 167 (Ohio 2016) ("Recklessness requires knowledge by the actor that his 'conduct will in all probability result in injury.'" (quoting *O'Toole v. Denihan*, 889 N.E.2d 505, 507 (Ohio 2008))).

Here, Whaley's level of culpability may present a close and potentially novel case. To start, no one disputes that Whaley violated department policy when he chose to leave the scene before a tow truck arrived. (Resp., Doc. 77, #2566–67). Instead, the question is whether Whaley realized the danger Clark posed to himself at that time. Although subject to debate, viewing the facts in the light most favorable to Clark,

Whaley arguably recognized (or at least should have) Clark's intoxication, yet declined to administer a breathalyzer test that would have confirmed it. (*Id.* at #2580). Instead, on this view of the facts, Whaley left Clark drunk, alone, and stranded on a darkened highway's median, knowing he may have to cross two lanes of interstate traffic on foot to receive assistance. (*Id.* at #2573; Doc. 66-1, #1800).

Without deciding the matter, this strikes the Court as potentially a situation "involving a high degree of probability that serious harm will result." *Anderson*, 983 N.E.2d at 274. Separately, the Court notes that Whaley's relevant conduct does not fit neatly within existing caselaw. Prior cases analyzed departmental violations where the official violated policy in furtherance of performing his or her immediate objective—e.g., firemen driving recklessly to reach a blaze, or a police officer violating car chase policies to catch a fleeing criminal. *See generally id.*; *Argabrite*, 75 N.E.3d 161. Here, Whaley's immediate policing objective likely should have been protecting, or perhaps arresting, Clark. By leaving (and violating policy in doing so), he furthered neither objective. Nonetheless, the Court cannot say whether or to what extent that may influence state-law immunity under O.R.C. § 2744.03(A).

In sum, it appears that no Ohio court has decided a case on similar facts. If that is so, Clark's immunity presents a novel state-law question. Accordingly, this Court leaves the matter to be decided in the Ohio courts. And as Saylor's state-law liability may (or may not) turn, at some level, on Clark's liability, that conclusion carries over to the claims against Saylor, as well. Thus, the Court **DISMISSES** these claims **WITHOUT PREJUDICE**.

20

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgement (Doc. 75) as to Plaintiff Clark's federal-law claims in her Complaint (Doc. 1) and **DISMISSES** those claims **WITH PREJUDICE**. Moreover, the Court declines to maintain supplemental jurisdiction over Plaintiff Clark's state-law claims, and so **DISMISSES** those claims **WITHOUT PREJUDICE**. To the extent Ohio law permits, Plaintiff may refile these claims in an appropriate state court. In that event, the Court encourages the parties to re-use the discovery already produced to avoid the duplication of efforts. As for this case, the Court **DIRECTS** the Clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

**SO ORDERED.**

January 5, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

21